HANSON BRIDGETT LLP
KURT A. FRANKLIN, SBN 172715
kfranklin@hansonbridgett.com
GEOFFREY R. PITTMAN, SBN 253876
gpittman@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366

Attorneys for Plaintiffs, Les Mills International
Limited, Les Mills Music Licensing Limited, Les
Mills Media Limited, and Les Mills Media U.S.,
Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| LES MILLS INTERNATIONAL LIMITED, LES MILLS MUSIC LICENSING LIMITED, LES MILLS MEDIA LIMITED, and LES MILLS MEDIA, U.S., INC., | Case No. |
| | **COMPLAINT** |
| Plaintiffs, | **(1) Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq*.)** |
| v. | **(2) Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426, *et seq*.)** |
| Jean-Michel Fournier, | |
| Defendant. | **(3) Breach of Contract** |
| | **JURY TRIAL DEMANDED** |

COMPLAINT

18094171.1

Plaintiffs Les Mills International Limited, Les Mills Music Licensing Limited, Les Mills Media Limited, and Les Mills Media U.S., Inc. (collectively, "Les Mills" or "Plaintiffs") complain against Defendant Jean-Michel Fournier ("Fournier" or "Defendant") as follows:

## THE PARTIES

1.      Plaintiff Les Mills International Limited ("LMI") is a New Zealand corporation with a principal place of business located in Auckland, New Zealand. LMI is a global fitness company with offices throughout the world and is the parent company to Les Mills Music Licensing Limited, Les Mills Media Limited, and Les Mills Media U.S., Inc.

2.      Plaintiff Les Mills Music Licensing Limited is a New Zealand corporation with a principal place of business located in Auckland, New Zealand. Les Mills Music Licensing Limited handles Les Mills' music licenses.

3.      Plaintiff Les Mills Media Limited is a New Zealand corporation with a principal place of business located in Auckland, New Zealand. Les Mills Media Limited is the parent company to Les Mills Media U.S., Inc. and is licensed to use LMI's trademarks to develop personal health and fitness multi-media fitness resources.

4.      Plaintiff Les Mills Media U.S., Inc. ("Les Mills U.S.") is a Delaware corporation, with a principal place of business is located in San Jose, California. However, Les Mills' United States based headquarters, and the principal place of business of Les Mills United States Trading, Inc. ("LMUST"), is located in Chicago, Illinois. Les Mills U.S. is a leading group fitness company providing a variety of exercise course offerings to a growing customer base with both in-person and virtual, at-home exercise class options. Les Mills U.S. is a subsidiary of Les Mills Media Limited and is part of the LMI group of companies.

5.      Defendant Jean-Michel Fournier is the former Chief Executive Officer ("CEO") of Les Mills U.S. and worked for the company from on or about December 1, 2016 to on or about October 29, 2021. From approximately December 1, 2016 until approximately September 1, 2021, Mr. Fournier served as Les Mills U.S.'s CEO. At Mr. Fournier's request, he resigned as the CEO, and negotiated a part time executive role for Les Mills. From September 1, 2021 to October 29, 2021, Mr. Fournier worked in a part-time role as an Early Stage Ventures Lead for Les Mills U.S.

18094171.1

On information and belief, Mr. Fournier currently resides in San Jose, California.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), as it arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

7.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under the California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.* and for breach of contract under 28 U.S.C. § 1367(a) because Plaintiffs state law claims are so closely related to their federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

8.    This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). LMI, Les Mills Music Licensing Limited, and Les Mills Media Limited are citizens of New Zealand. Les Mills U.S. is a citizen of Delaware. On information and belief, Defendant Fournier is a citizen of California. The amount in controversy exceeds $75,000.

9.    Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391 because Defendant resides in the Northern District of California and a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

## INTRADISTRICT ASSIGNMENT

10.    A substantial part of the events and omissions which give rise to the claims asserted took place in Santa Clara County, California. Thus, under Civil Local Rule 3-2(c) and (e), this action should be assigned to the San Jose Division of this District.

## FACTUAL ALLEGATIONS

### *Les Mills develops and protects Confidential and Trade Secret Information.*

11.    LMI is a leading fitness company providing a variety of exercise course offerings to a growing customer base with both traditional in-person (direct to business, i.e., gyms) and virtual at-home exercise class (direct to consumer) options. LMI is the group parent company and is incorporated in New Zealand. Les Mills U.S. is a United States company that employed defendant Fournier and is a subsidiary of Les Mills Media Limited, which is a New Zealand

company that is licensed to use LMI's trademarks to develop personal health and fitness multi-media fitness resources. Les Mills Music Licensing Limited is a New Zealand based company that handles Les Mills' music licenses. All four Plaintiffs are collectively referred to herein as "Les Mills" or "Plaintiffs." Stemming in part from the COVID-19 pandemic and related stay-at-home public health orders, Les Mills used its proprietary content, its trainers turned influencers, and music licensing deals to accelerate its virtual online offerings made directly to consumers. Through years of hard work and substantial monetary investment, Les Mills has placed itself at the forefront of the group exercise industry, offering cutting edge group fitness classes to customers throughout the United States and the rest of the world.

12.     To achieve and maintain a leadership position in the group fitness industry, Les Mills has invested substantial time, effort, and money in developing technology, procedures, business and licensing agreements, and its customer base. The results of these efforts include, but are not limited to, strategic business relations, licensing, product strategies, and proprietary processes. Plaintiffs' confidential, proprietary, and trade secret information includes, but is not limited to, Plaintiffs' emails containing privileged internal communications, financial statements, prospective customer bids, confidential business agreements, details about potential new business opportunities, internal pricing information, detailed customer account information, strategic planning information, operational plans, sales targets, information regarding strategic alliances, and music licensing agreements (collectively, "Confidential and Trade Secret Information"). This Confidential and Trade Secret Information and know-how took decades to develop, and is worth millions of dollars to Les Mills and forms the basis for their business.

13.     Les Mills has spent decades developing the processes and systems that consist of its Confidential and Trade Secret Information. Les Mills' Confidential and Trade Secret Information is extremely valuable to Les Mills, and would be to any competitor. Access to the Confidential and Trade Secret Information would enable competitors to adopt Les Mills' business processes and strategies, including, but not limited to, prospective customer bids and lists, confidential business agreements, details about potential new business opportunities, detailed information about existing customers, internal sales and pricing information, information regarding strategic

18094171.1

alliances, and information regarding confidential music licensing agreements.

14.     Les Mills' Confidential and Trade Secret Information has independent economic value and is not generally known to the public. In addition, as alleged herein, Les Mills has taken reasonable and appropriate steps to maintain the confidentiality of its Confidential and Trade Secret Information.

15.     By this action, Les Mills is taking a necessary step to ensure that its Confidential and Trade Secret Information does not become public or known to its competitors. In order to protect is Confidential and Proprietary Information, Les Mills requires all employees to sign employment agreements with confidentiality provisions that prohibit dissemination of confidential information outside Les Mills except under limited circumstances. In addition, Les Mills U.S.-issued employee laptops are password protected, as is Les Mills U.S.' computer network. In addition, all Les Mills U.S. employees agree to abide by an Acceptable Use Policy regarding Les Mills U.S.-owned equipment and access to the Les Mills computer network. As described below, Les Mills also took reasonable steps to protect its Confidential and Trade Secret Information through its agreements with Mr. Fournier.

***Defendant Fournier Promises to Protect and Return Les Mills' Confidential and Trade Secret Information as a Condition of His Employment at Les Mills U.S.***

16.     On or about December 1, 2016, Les Mills U.S. hired Fournier to serve as its Chief Executive Officer. As CEO of Les Mills U.S., Fournier was responsible for leveraging LMI's Les Mills On Demand video on demand streaming service launched in 2015 as its primary consumer product and scaling the business to achieve key metrics. He led its worldwide consumer business and direct to consumer digital portfolio products. Fournier served as Les Mills U.S.' CEO from December 1, 2016 until he voluntarily stepped down to work fewer hours on or about September 1, 2021. Attached hereto as <u>Exhibit A</u> is a true and correct copy of Mr. Fournier's December 1, 2016 Employment Agreement ("CEO Agreement").

17.     On or about September 7, 2021, Fournier executed an End of Full Time Employment Agreement with Les Mills U.S., which documented Fournier's decision to resign from his full-time CEO position from the company. Attached hereto as <u>Exhibit B</u> is a true and

18094171.1

correct copy of the executed End of Full Time Employment Agreement.

18.     On or about September 7, 2021, Fournier accepted a part-time, nine month position at Les Mills U.S., which he led and negotiated, where he agreed to work two days a week in the position of "Early Stage Ventures Lead." A true and correct copy the signed offer sheet for the part-time Early Stage Ventures Lead position is attached hereto as Exhibit C ("Early Stage Ventures Lead Agreement").

19.     About a month and a half after accepting the Early Stage Ventures Lead position, via a text message to LMI's CEO, Clive Ormerod, Fournier resigned from Les Mills U.S. on or about October 18, 2021, with an effective resignation date of October 29, 2021.

20.     As part of his employment as CEO, and later as its Early Stage Ventures Lead, Les Mills U.S. provided Fournier with two MacBook Pro laptop computers and an iPad Pro 12 for him to conduct his work. Through his employment, Fournier had access to Les Mills-owned property, such as hardware (including, but not limited to, computers, laptops, thumb drives, and similar devices), electronically-stored information and other digital files, cloud accounts, smart phones, iPads, electronic access keys, trade secrets, proprietary information, information relating to Les Mills' music licensing arrangements, business strategy and governance, information related to customers, information related to employees, customer lists, vendor lists, supplier lists, and pricing lists.

21.     Fournier's CEO Agreement, the End of Full Time Employment Agreement, and the Early Stage Ventures Lead Agreement with Les Mills U.S. provided the terms and conditions of his employment.

22.     Through his execution of the CEO Agreement, Fournier expressly agreed that

> during his employment and for a period of two (2) years thereafter, he will hold in confidence all Confidential Information of the Company[1] and the Associated Companies[2] that came into his knowledge during his employment by the Company and will not disclose, publish[,] or make use of such Confidential Information without the prior written consent of the Company, except to the extent disclosure of

[1] "Company" is defined in the CEO Agreement as Les Mills Media U.S., Inc.

[2] "Associated Companies" is defined as "any parent or subsidiary of the Company and any entity in which the Company has a twenty percent or greater ownership interest." (CEO Agreement, § 8(a).)

Case No.

18094171.1

1    Confidential Information is mandated by a court order or is otherwise necessary to
2    comply with applicable laws.

3  (CEO Agreement, § 8(c).)

4        23.    Through his execution of the CEO Agreement, Fournier further agreed

5    to hold in confidence all Trade Secrets of the Company and the Associated
     Companies that came into his knowledge during his employment by the Company
6    and shall not disclose, publish, or make use of at any time after the date hereof such
     Trade Secrets without the prior written consent of the Company for as long as the
7    information remains a Trade Secret, except to the extent disclosure of a Trade
     Secret is mandated by a court order or is otherwise necessary to comply with
8    applicable laws.

9  (CEO Agreement, § 8(d).)

10       24.    The CEO Agreement defines "Confidential Information" as:

11   any data or information (other than Trade Secrets) owned by the Company or any
     Associated Companies that is proprietary and confidential in nature and not
12   generally known to the public or to competitors in the industry, including, but not
     limited to, any non-public information (regardless of whether in writing or retained
13   as personal knowledge) pertaining to research and development; product costs and
     processes; stockholder information; pricing, cost, or profit factors; quality
14   programs; annual budget and long-range business plans; marketing plans and
     methods; contracts and bids; and personnel.

15

16  (CEO Agreement, § 8(a).)

17       25.    The CEO Agreement further defines "Trade Secret" as "trade secret as defined by

18  applicable state law." (CEO Agreement, § 8(a).) Because the CEO Agreement is governed by the

19  "laws of the state of California" (*id.*, § 22), "trade secret" means:

20   information, including a formula, pattern, compilation, program, device, method,
     technique, or process, that: (1) [d]erives independent economic value, actual or
21   potential, from not being generally known to the public or to other persons who can
     obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts
22   that are reasonable under the circumstances to maintain its secrecy.

23  Cal. Civ. Code, § 3426.1(d).

24       26.    In addition to agreeing to hold in confidence all Confidential Information and

25  Trade Secret Information and to not "disclose, publish[,] or make use" of such information

26  "without the prior written consent of [Les Mills U.S.]," Fournier also expressly agreed to the

27  following "Return of Company Property" provision in the CEO Agreement:

28       All records, designs, patents, business plans, financial statements, manuals,

-7-

18094171.1

memoranda, customer lists, computer data, computer information, and other property or information delivered to or compiled by [Fournier] by or on behalf of the Company (including the respective subsidiaries thereof) or its representatives, vendors[,] or customers **shall be and remain the property of the Company**, and be subject **at all times to its discretion and control**. Upon the request of the Company and in any event, **upon the termination of [Fournier's] employment with the Company, [Fournier] shall deliver all such materials to the Company**.

(CEO Agreement, § 9 (emphasis added.))

27.  Consistent with the above confidentiality provisions of the CEO Agreement, Fournier's End of Full Time Employment Agreement specifically provided as follows:

You [Fournier] acknowledge that your obligations under Section **8** through **11** and **19** of your [CEO] Employment Agreement survive termination in accordance with their terms. To enable the Company to exercise its rights under Section **11** of your [CEO] Employment Agreement, You [Fournier] agree to notify the Company if you accept employment or agree to provide services to a competitor of the Company or Les Mills Group.

(End of Full Time Employment Agreement, ¶ 6 (emphases in original).)

28.  In addition, Fournier's Early Stage Ventures Lead Agreement contained the following additional express provisions regarding confidentiality and duty of loyalty to Les Mills:

You [Fournier] agree to keep confidential information regarding Les Mills Media U.S., Inc. and the Les Mills Group that comes to your attention in the course of performing your duties confidential and not to share with any third parties without Les Mills Media U.S., Inc.'s consent. You acknowledge that your work will be regarded as "work made for hire" as that term is used in the United States Copyright Laws and be owned by Les Mills Media U.S., Inc. . . .

You [Fournier] acknowledge and understand that California employees owe their employers a fiduciary duty of loyalty, and that while employed by the Company . . . you must give preference to the Company to all business. If You [Fournier] engage in any outside employment, you will immediately notify Les Mills. Further, to protect Les Mills' confidential information, proprietary information, trade secrets, and business interest, if you engage in outside employment, you agree to, and understand the following:

- Outside employment must not interfere with your work performance or work schedule;

- You [Fournier] may not use the Company's property, trademarks, brand, or reputation in connection with any outside employment;

- You [Fournier] **must comply with all of the Company's policies, including those relating to conflicts of interest, confidentiality, and protection of confidential, proprietary, and trade secret information**; and

- During Term, and any subsequent employment by the Company,

18094171.1

> you may not engage in any outside employment for an employer that the Company, acting reasonably considers: is a major competitor of the Les Mills Group; or otherwise competes with the Les Mills Group, without prior written consent of the Company.

(Early Stage Ventures Lead Agreement, at 2 (emphasis added).)

**_Defendant Fournier negotiates a new position with Les Mills U.S., simultaneously interviews with direct competitors, downloads Confidential and Trade Secret Information, and resigns._**

29.     Unbeknownst to Les Mills, on or about June 17, 2021, using an almost two-year old email where Fournier had been introduced to Carl Daikeler, the CEO of the Beachbody Company, Inc. ("Beachbody") – a direct competitor of Les Mills – Fournier sent an email reintroducing himself to Mr. Daikeler. In that email, Fournier explained that he had been "leading Les Mills on-demand and the entire direct-to-consumer portfolio of Les Mills Media" and explained that he was "looking for new opportunities with local companies." In subsequent emails, Fournier was introduced to Beachbody's Senior Vice President, Chief of Staff, Matthew Halpern, who helped set up a further meeting with Mr. Daikeler. Reimbursed for travel expenses by Beachbody, Fournier arranged to fly to Los Angeles on July 8, 2021, to spend the day in Los Angeles and meet with Mr. Daikeler and other Beachbody executives. As a preface to the call, on July 7, 2021, Mr. Halpern wrote to Mr. Fournier: "Look forward to tomorrow. I know Carl will want to discuss what opportunities are out there that we are not doing, what is Les Mills doing right now that we are not, and what you see and what we are/are not doing right. **_So, essentially what we discussed. If you have any slides or visuals[,] we will be able to project._**" (emphasis added).

30.     Unbeknownst to Les Mills, via email, on June 21, 2021, Fournier reached out to Alberto Perlman, co-founder and CEO of Zumba Fitness, LLC ("Zumba"). On information and belief, while Zumba had typically licensed and was used by instructors for in-person group classes, similar to Les Mills during the COVID-19 pandemic, Zumba had launched an online platform for customers to take virtual classes to workout with trainers from home. On information and belief, after trading emails, Fournier spoke with Mr. Perlman on or about June 25, 2021, and offered to fly to Florida to meet him. On or about July 20, 2021, with respect to his exploring

18094171.1

executive employment other than with Les Mills U.S., Fournier sent an email to Mr. Perlman explaining that "I'm looking at making a decision end of August, September timeframe. Let me know if you think it would be valuable to brainstorm further with you and your team about business potential?"

31.     During this same time period, in or around June of 2021, Fournier notified Les Mills that "for personal reasons," he was considering resigning from his position as CEO of the company and that he may no longer wish to continue in his full-time role with the company. To support Fournier and give him space to consider his future Les Mills U.S. offered Fournier two months paid leave.

32.     After indicating to Les Mills U.S. and LMI that he was considering stepping down as the CEO of Les Mills U.S. in June of 2021, Fournier took paid leave from July 1, 2021 through August 31, 2021, while still serving as the CEO of Les Mills U.S.

33.     While Les Mills U.S. was still paying him as CEO, on July 13, 2021, Fournier traded emails with Carl Daikeler of Beachbody regarding due diligence that Les Mills U.S. had done on the fitness app company iFit (formerly ICON Health and Fitness, based in Utah), whose brands included NordicTrack, ProForm, Freemotion, Weider, Gold's Gym, and SWEAT.

34.     On July 30, 2021, while Les Mills U.S. was still paying him as CEO, Fournier also traded emails with Beachbody President and Co-Founder, Jon Congdon, about strategies related to how Les Mills had been approaching direct to the consumer online fitness classes.

35.     While Les Mills U.S. was still paying him as CEO, on or about August 10, 2021, Fournier introduced Carl Daikeler to Chris Vinckier, Vice President, Software Product Management at VIZIO, an Irvine, California based company that designs and sells televisions, viewer data, and advertising. In an email, Fournier wrote, "I do believe that BeachBody could support Vizio strategy on the wellness space. I'll let you follow up directly with Carl. Carl, [a]s discussed, Chris is the Head of product reporting to Vizio's CEO. Chris moved to Vizio a few months ago from Apple. I do believing [sic] Beachbody app and content would be a good fit to Vizio's customer base." On information and belief, after a call between Mr. Vinckier and Mr. Daikeler, on August 12, 2021, Mr. Daikeler emailed Fournier the following message:

1   *"Partnerships and international. That's where we're leaning. But we will talk next week. I want*
2   *to work with you dude and make shit happen!"* (emphasis added).

3        36.    While Les Mills U.S. was still paying him as CEO, on or about August 15, 2021,
4   Fournier emailed Mr. Daikeler a first draft of the role description for his future proposed position
5   at Beachbody, and explained his compensation at Les Mills U.S. Mr. Fournier also confirmed with
6   Mr. Daikeler on August 16, 2021 that he could start within six weeks of any offer date, where he
7   could meet with his "interested partners" including LA Fitness, Amazon/Halo, Facebook,
8   Sketchers, VIZIO, fitness influencers, local fitness leaders, and that Fournier would "further
9   engage [his] network."

10       37.    While Les Mills U.S. was still paying him as CEO, on or about August 17, 2021, in
11  an email exchange, Carl Daikeler informed Fournier that he wished to "touch base with Phillip
12  [Phillip Mills, the founder and Executive Director of LMI] as a courtesy. I would want that as a
13  CEO to CEO, personally if someone was talking to one of my senior execs but wanted to maintain
14  a good relationship." On information and belief, Fournier had mentioned to Mr. Daikeler that
15  Phillip Mills was aware that Fournier was discussing a possible role with Beachbody, and Fournier
16  dissuaded Mr. Daikeler from contacting Phillip Mills at that time. However, Fournier did not have
17  any such discussion with Phillip Mills. Instead of telling Mr. Mills that Fournier was seeking
18  employment with Beachbody as an executive, Fournier's communication with Mr. Mills about his
19  contact with Beachbody related to more generic industry networking that would benefit LMI and
20  further that Mr. Daikeler (not Fournier) had initiated the possibility of Fournier coming to work
21  for Beachbody. Further, on information and belief, rather than have Mr. Daikeler and Mr. Mills
22  speak to each other, Fournier instead encouraged Mr. Daikeler to speak with certain directors of
23  the LMI board or others with whom Fournier had worked.

24       38.    While Les Mills U.S. was still paying him as CEO, five days later, on or about
25  August 22, 2021, Fournier wrote an email about his potential future role as the Early Stage
26  Ventures Lead at Les Mills U.S., including "lead[ing] executive engagement" with Google, Fit
27  Bit, Google TV, YouTube, Apple, Amazon, and Facebook, as well as engaging with startups and
28  venture capital firms like Kleiner Perkins, Sequoia, and Goldman Sachs.

18094171.1

39.     In sum, by August 2021, while planning to leave Les Mills U.S. to find a new executive or CEO role, on information and belief, Fournier was already sharing Les Mills' confidential information, Les Mills' business strategies, and Les Mills' opportunities in discussions with companies that provide similar fitness products, media, trainings, and services to Les Mills, including Beachbody, Zumba, Hygear, and Lululemon Athletica, Inc.

40.     Critically, while on his two month paid leave from Les Mills U.S. and while he was searching and interviewing for leadership employment with other fitness companies like Beachbody that desired to expand on-demand and direct-to-consumer fitness media, in August 2021, Fournier started reviewing and downloading troves of Les Mills' proprietary, trade secret, and other confidential files. More specifically, during this time period, Fournier downloaded thousands of Les Mills electronic files to his work laptop computer and his personal home computer– containing some of Les Mills' most critical Confidential and Trade Secret Information.

41.     Based on Les Mills' preliminary and ongoing forensic investigation, Fournier accessed, read, and/or downloaded approximately 900 confidential files related to Les Mills' music licensing arrangements on his laptop computer on August 31, 2021. He also accessed, read, and/or downloaded approximately 454 files containing Les Mills' confidential music licensing agreements to his laptop computer on August 31, 2021. In addition, between August 16, 2021 and August 23, 2021, Fournier accessed, read, downloaded, and/or deleted more than 6,000 files containing Les Mills' Confidential and Trade Secret Information on his work laptop computer and his personal home computer. These files included board papers, strategy documents (including various Les Mills group, product, and department strategy documents), key financial documents, and music license agreements. Les Mills' forensic investigation is ongoing.

42.     The details of Les Mills' music licensing arrangements are critical information to Les Mills' business that Fournier would have had no reason to access in his role as CEO of Les Mills U.S. or in his part-time role with the company. Tellingly, Les Mills' technology records show that Fournier had not accessed the confidential files related to its music licensing arrangements for over a year prior to his recent access to those files before he resigned from the company.

18094171.1

43.     Upon his return to Les Mills U.S. in or around September 1, 2021, Fournier confirmed his decision that he no longer wished to serve as Les Mills U.S.' CEO. Again at Mr. Fournier's initiation, Fournier and LMI entered into negotiations to create a part-time position at Les Mills U.S. for Fournier where he would only work two to three days per week rather than full time. Mr. Fournier indicated that he hoped to "explore other board governance opportunities," in addition to his new part-time role at Les Mills U.S. At this time, Les Mills did not know that Mr. Fournier had been taking company data and opportunities, and sharing information with competitors.

44.     On or about September 4, 2021, LMI sent Fournier an offer letter for the position of Early Stage Ventures Lead. On or about September 7, 2021, Mr. Fournier signed the Early Stage Ventures Lead Agreement, which had 9-month term and, among other things, obligated Mr. Fournier to keep confidential information regarding Les Mills. (*See* paragraph 28, above.) The Early Stage Ventures Lead Agreement also specifically outlined Fournier's duty of loyalty to Les Mills, wherein Fournier acknowledged that he was to give preference to Les Mills U.S. to all business opportunities, and that while employed by Les Mills U.S., Fournier was prohibited from working for competitors. (*See id.*)

45.     On September 8 and 9, 2021, a day after Fournier began as Les Mills U.S.' Early Stage Ventures Lead, he traded emails with Mark Smith, a former director of LMI, about Beachbody Chief Strategy Officer, Kathy Vrabeck, calling Mr. Smith as a reference check for Mr. Fournier.

46.     On Monday, October 18, 2021, Fournier sent LMI CEO, Clive Ormerod, a text message indicating his intent to resign from Les Mills U.S. later that month. At this time, Fournier had not told Les Mills that he had accepted a job with a competitor in a similar role as his CEO role at Les Mills U.S.

47.     One week later, while still employed by Les Mills U.S., on October 25, 2021, Fournier communicated with Anthanase Kollias, CEO of K-Invent, about a potential project with Google. Fournier had previously served on K-Invent's advisory board as an expert, and as Les Mills U.S.' CEO, and informed Mr. Kollias on October 25, 2021 that: "I'm going to Beachbody, a

18094171.1

1  nutrition and fitness company in LA."

2      48.    Tellingly, on October 29, 2021 – Mr. Fournier's final day of employment with Les

3  Mills U.S – Fournier downloaded a document containing details of Les Mills' direct to consumer

4  business overview, strategies, plans, and ambitions.

5  ***Defendant Fournier takes job with direct competitor, Beachbody, and downloads additional***

6  ***Confidential and Trade Secret Information from Les Mills***

7      49.    On October 31, 2021, days ***after*** Fournier had resigned from Les Mills U.S., using

8  his Les Mills U.S. credentials, Fournier illegally downloaded three additional Les Mills files

9  containing Confidential and Trade Secret Information to his personal desktop computer located at

10  his home. The files that Fournier downloaded to his personal desktop included confidential music

11  licensing information, information regarding Les Mills' high season offers and scenario planning

12  for its direct-to-consumer online fitness programs (which directly competes with Beachbody's

13  service), as well as internal product management meeting presentation materials.

14      50.    The very next day, November 1, 2021, Beachbody issued a press release about

15  Fournier accepting a new job with it as its President, Global Partnerships and Corporate

16  Development, effective November 1, 2021. In the press release, Fournier is quoted as follows:

17  "Beachbody's integrated fitness and nutrition offering, broad customer base and expansive library

18  of IP provide an incredible foundation to expand the Company's reach and drive meaningful

19  growth . . . I look forward to enhancing the Company's value proposition through strategic

20  partnerships and other opportunities to bring Beachbody's unmatched offering to millions more

21  customers."

22      51.    On November 1, 2021, Fournier changed his LinkedIn page to reflect his new

23  position with Beachbody.

24  ***Fournier deletes and destroys all information on his laptop computers and iPad before***

25  ***returning them to Les Mills U.S., and fails to provide adequate assurances that Confidential***

26  ***and Trade Secret Information was not uploaded or backed up to a cloud-based storage account***

27  ***or other electronic storage device.***

28      52.    On or about November 2, 2021, LMI became aware that Fournier had started

working for one of LMI's direct competitors, Beachbody, where he would be responsible for areas directly competitive to Les Mills' business. The same day, LMI's CEO Clive Ormerod called Mr. Fournier to remind him of his ongoing obligations of confidentiality and non-disclosure.

53.     On or about November 2, 2021, LMI initiated a forensic examination of Mr. Fournier's Les Mills accounts and emails to determine whether there had been any unauthorized access to or downloads of Les Mills' confidential, proprietary, or trade secret information. On or about November 2, 2021, Fournier was contacted by Caitlin Clemens, Vice President People & Culture for Les Mills United States Trading, Inc. ("LMUST"), a subsidiary of LMI, about returning his devices and related digital media to Les Mills U.S. Fournier said he would FedEx them to her and Ms. Clemens confirmed the shipping address.

54.     On November 8, 2021, Ms. Clemens contacted Mr. Fournier to request tracking details for the devices he was returning. Mr. Fournier advised that he had not yet shipped them. On November 9, 2021, Ms. Clemens contacted Fournier to arrange for a time when Fournier would be home so that his Les Mills U.S.-issued devices could be picked up by a courier.

55.     On November 9, 2021, through its agents at First Legal, Les Mills collected Fournier's MacBook Pro laptop computer and his iPad 12 from Fournier directly. On or about November 12, 2021, following chain-of-custody protocol, a forensic examination by Plaintiffs' retained computer forensics firm, Digital Mountain, revealed that Fournier had destroyed evidence by completing a hard reset (*i.e.,* factory default reset) of both devices prior to turning them over to Les Mills' agents (First Legal, Hanson Bridgett LLP, and Digital Mountain), leaving both devices fully encrypted and unable to be forensically examined. In addition, Fournier's iPad was returned in a damaged physical state and appeared to have been dropped.

56.     On or about November 11, 2021, LMI's CEO, Clive Ormerod, called Fournier to tell him that Les Mills knew that Fournier had accessed and downloaded confidential and highly sensitive information prior to leaving the company. Mr. Ormerod told Fournier that Les Mills was required to take reasonable measures to protect its trade secret information. Mr. Ormerod specifically referenced information related to Les Mills' music licensing agreements, board information, and strategy papers. On information and belief, Mr. Fournier reviewed Les Mills'

18094171.1

1    files on his personal desktop computer during his telephone call with Ormerod.

2        57.    On November 12, 2021, Les Mills, through its counsel Hanson Bridgett LLP, wrote

3    to Fournier via email at 9:20 a.m. asking him or his attorney "to arrange for immediate return of

4    all Les Mills' confidential information, along with a coordinated forensically sound permanent

5    deletion of any copies using Les Mills approved protocols." In this communication, Fournier was

6    informed that Les Mills had initiated a digital forensic review and Fournier was asked not to share

7    any Les Mills information, and to preserve any such information in its as-is state. The cover email

8    to Mr. Fournier stated, "[a]fter reviewing the attached letter, please contact me to arrange for

9    immediate return of all Les Mills' confidential information, along with a coordinated forensically

10   sound permanent deletion of any copies using Les Mills approved protocols." The letter attached

11   to the cover email further stated: "I write to remind you of your post-employment obligation to

12   keep all Les Mills' proprietary information, trade secrets, and related information confidential. . . .

13   Moreover, if you still have any of this information in your possession, custody, or control, you

14   must preserve and immediately return it – along with any devices upon which this information

15   might be stored. If this information has been moved to a server or cloud account, you must provide

16   immediate access so that Les Mills can ensure forensically sound removal of this data."

17       58.    Later that same day, at approximately 11:53 a.m. on November 12, 2021, Les

18   Mills, through its agents (First Legal), arranged for a second MacBook Pro laptop to be picked up

19   from Mr. Fournier's home. This laptop was a laptop that Mr. Fournier previously used for his

20   work for Les Mills U.S. Before returning the device to Les Mills U.S., however, Fournier *again*

21   initiated a factory reset to encrypt the information on the device, to erase his activity on the laptop,

22   and to prevent the data on the laptop from being recovered. This second laptop computer was also

23   returned in physically damaged condition. In the evening on November 12, 2021, Les Mills' agent

24   (Hanson Bridgett LLP) issued a still more formal demand for preservation of evidence and

25   litigation hold to Mr. Fournier.

26       59.    Through additional communications between counsel for Les Mills and Fournier

27   from November 16, 2021 through December 7, 2021, Les Mills further attempted to protect its

28   Confidential and Trade Secret Information by requesting that Fournier agree to a protocol whereby

**COMPLAINT**

18094171.1

1   Fournier would turn over to a third party forensic examination firm all devices and iCloud account

2   backups, iTunes backups, backups to other cloud accounts, backups to networks or servers, and

3   backups to portable drives on which Fournier had stored Confidential and Trade Secret

4   Information so that they could be forensically examined for any Les Mills Confidential or Trade

5   Secret Information. Les Mills also requested that Fournier execute a declaration containing the

6   basic facts of his downloads and subsequent actions with respect to Les Mills' Confidential and

7   Trade Secret Information.

8       60.     To date, Fournier has rebuffed Les Mills' efforts to obtain the necessary access to

9   his devices and files so that Les Mills can ensure that Fournier no longer has access to or copies of

10  its Confidential and Trade Secret Information.

11      61.     Apart from his return of his hard reset (*i.e.*, wiped) laptops and iPad, Fournier has

12  failed to provide Les Mills with access to any of his other electronic devices that might contain

13  Les Mills' Confidential and Trade Secret Information. Moreover, because he deleted all of the

14  files from his laptops and iPad, and left those devices completely unavailable for forensic

15  examination, Les Mills has no information about whether Fournier backed up any of Les Mills'

16  Confidential and Trade Secret Information to other devices or cloud-based storage accounts before

17  returning his wiped devices.

18      62.     Les Mills thus has no recourse but to bring this action. Fournier works for Les

19  Mills' competitor, Beachbody, and Les Mills' forensic examination to date shows that Fournier

20  copied thousands of files of its Confidential and Trade Secret Information right before he went to

21  work for Beachbody. Moreover, Fournier has failed to provide Les Mills with sufficient

22  information regarding whether Fournier still maintains access to the more than 7,350 files he

23  improperly downloaded and accessed prior to him leaving Les Mills U.S.

### First Cause of Action

### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*)

### Brought by All Plaintiffs

27      63.     Plaintiffs re-allege and incorporate by reference each and every allegation

28  contained in paragraphs 1 through 62 of this Complaint.

18094171.1

64.     As set forth above, over many years and at significant cost, Les Mills developed its Confidential and Trade Secret Information, including business strategies, strategic business relations, customer information, licensing, product strategies, and proprietary processes. More specifically, Les Mills' Confidential and Trade Secret Information consists of privileged internal communications, financial statements, prospective customer bids, confidential business agreements, details about potential new business opportunities, internal pricing information, detailed customer account information, strategic planning information, operational plans, sales targets, information regarding strategic alliances, and music licensing agreements. This Confidential and Trade Secret Information comprises "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. Les Mills is the owner of its Confidential and Trade Secret Information.

65.     Les Mills' Confidential and Trade Secret Information gives it a competitive advantage over potential and existing competitors, including Beachbody. Such information derives significant, independent economic value from not being generally known to the public, to Les Mills' competitors, or to other persons who would benefit from the disclosure or use of the information.

66.     Les Mills' Confidential and Trade Secret Information is not readily ascertainable through proper means or from generally available, public sources.

67.     At all relevant times, Les Mills has made reasonable efforts to preserve the confidentiality of its Confidential and Trade Secret Information. Confidentiality obligations are included in all employment agreements and company-issued laptops are password protected, as is Les Mills' network. Les Mills has also taken reasonable steps to protect its Confidential and Trade Secret Information through its CEO Agreement, End of Full Time Employment Agreement, and Early Stage Ventures Lead Agreement with Fournier. (*See* paragraphs 22-28.)

68.     Fournier has misappropriated trade secrets within the meaning of 18 U.S.C. § 1839(5) by using improper means to acquire Confidential and Trade Secret Information when he knew or had reason to know that his knowledge of Confidential and Trade Secret Information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Fournier

1   wrongfully acquired the Confidential and Trade Secret Information by downloading and
2   potentially transferring Confidential and Trade Secret Information – such as board papers, strategy
3   documents (including various Les Mills group, product, and department strategy documents), key
4   financial documents, and music license agreements – to his laptop and desktop computers, and
5   potentially to his iCloud account, iTunes account, other cloud accounts, and/or to networks,
6   servers, or other portable drives in violation of the CEO Agreement. That he did so wrongfully is
7   confirmed by, among other things, the deliberate fashion in which he selected the information to
8   be transferred, the dates of his downloads, the steps he took to cover his tracks by performing hard
9   resets on his laptop computers and iPad, and his attempts to downplay what he had done with
10  representations contrary to the forensic evidence.

11          69.     On information and belief, Fournier still maintains possession or access to Les
12  Mills' Confidential and Trade Secret Information, and poses a threat to use or disclose that
13  information. Given that Fournier now works for Les Mills' direct competitor, Beachbody, he
14  poses a serious risk of improper use or disclosure of trade secrets.

15          70.     On information and belief, Fournier has gained, or will gain, substantial benefit
16  from his misappropriation of Les Mills' Confidential and Trade Secret Information, to Les Mills'
17  substantial detriment.

18          71.     As a result of Fournier's unlawful conduct, Les Mills' Confidential and Trade
19  Secret Information has been compromised, and Les Mills is substantially threatened by Fournier's
20  further use and/or dissemination of that information.

21          72.     As a direct and proximate result of Fournier's misappropriation of the Confidential
22  and Trade Secret Information, Les Mills has suffered and will continue to suffer damages in an
23  amount to be proven at trial.

24          73.     On information and belief, Fournier's unlawful actions were willful and malicious,
25  and with the deliberate intent to injure Les Mills' business, thereby entitling Les Mills to
26  exemplary damages and/or attorneys' fees in an amount to be proven at trial under 18 U.S.C.
27  § 1836(b)(3)(C)-(D).

28          74.     Les Mills has suffered and will continue to suffer irreparable harm as a result of

18094171.1

1   Fournier's actual and threatened misappropriation.  Because Les Mills has no adequate remedy at

2   law for this present and future harm, it is entitled to an order prohibiting Fournier from using or

3   disclosing, or threatening to use or disclose, Les Mills' Confidential and Trade Secret Information,

4   from deleting any of Les Mills' Confidential and Trade Secret Information, and from obtaining

5   any benefit from his wrongful possession and use of the Confidential and Trade Secret

6   Information.  Unless enjoined by this Court, said misappropriation of Les Mills' Confidential and

7   Trade Secret Information, actual or threatened, will cause great and irreparable injury to Les Mills.

8                                           **Second Cause of Action**

9           **(Violation of California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*)**

10                                          **Brought by All Plaintiffs**

11          75.     Plaintiffs re-allege and incorporate by reference each and every allegation

12   contained in paragraphs 1 through 74 of this Complaint.

13          76.     As set forth above, over many years and at significant cost, Les Mills developed its

14   Confidential and Trade Secret Information, including business strategies, strategic business

15   relations, customer information, licensing, product strategies, and proprietary processes. More

16   specifically, Les Mills' Confidential and Trade Secret Information consists of privileged internal

17   communications, financial statements, prospective customer bids, confidential business

18   agreements, details about potential new business opportunities, internal pricing information,

19   detailed customer account information, strategic planning information, operational plans, sales

20   targets, information regarding strategic alliances, and music licensing agreements. This

21   Confidential and Trade Secret Information comprises "trade secrets" under the California Uniform

22   Trade Secrets Act, Cal. Civ. Code § 3426, *et seq*. Les Mills is the owner of its Confidential and

23   Trade Secret Information.

24          77.     Les Mills' Confidential and Trade Secret Information gives it a competitive

25   advantage over potential and existing competitors, including Beachbody. Such information derives

26   significant, independent economic value from not being generally known to the public, to Les

27   Mills' competitors, or to other persons who would benefit from the disclosure or use of the

28   information.

18094171.1

78.     Les Mills' Confidential and Trade Secret Information is not readily ascertainable through proper means or from generally available, public sources.

79.     At all relevant times, Les Mills has made reasonable efforts to preserve the confidentiality of its Confidential and Trade Secret Information. Confidentiality obligations are included in all employment agreements and company-issued laptops are password protected, as is Les Mills' network. Les Mills has also taken reasonable steps to protect its Confidential and Trade Secret Information through its CEO Agreement, End of Full Time Employment Agreement, and Early Stage Ventures Lead Agreement with Fournier. (*See* paragraphs 22-28.)

80.     Fournier has misappropriated trade secrets within the meaning of Cal. Civ. Code § 3426.1(b) by using improper means to acquire Confidential and Trade Secret Information when he knew or had reason to know that his knowledge of Confidential and Trade Secret Information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. Fournier wrongfully acquired the Confidential and Trade Secret Information by downloading and potentially transferring Confidential and Trade Secret Information – such as board papers, strategy documents (including various Les Mills group, product, and department strategy documents), key financial documents, and music license agreements – to his laptop and desktop computers, and potentially to his iCloud account, iTunes account, other cloud accounts, and/or to networks, servers, or other portable drives in violation of the CEO Agreement. That he did so wrongfully is confirmed by, among other things, the deliberate fashion in which he selected the information to be transferred, the dates of his downloads, the steps he took to cover his tracks by performing hard resets on his laptop computers and iPad, and his attempts to downplay what he had done with representations contrary to the forensic evidence.

81.     On information and belief, Fournier still maintains possession or access to Les Mills' Confidential and Trade Secret Information, and poses a threat to use or disclose that information. Given that Fournier now works for Les Mills' direct competitor, Beachbody, he poses a serious risk of improper use or disclosure of trade secrets.

82.     On information and belief, Fournier has gained, or will gain, substantial benefit from his misappropriation of Les Mills' Confidential and Trade Secret Information, to Les Mills'

18094171.1

1  substantial detriment.

2       83.    As a result of Fournier's unlawful conduct, Les Mills' Confidential and Trade

3  Secret Information has been compromised, and Les Mills is substantially threatened by Fournier's

4  further use and/or dissemination of that information.

5       84.    As a direct and proximate result of Fournier's misappropriation of the Confidential

6  and Trade Secret Information, Les Mills has suffered and will continue to suffer damages in an

7  amount to be proven at trial.

8       85.    On information and belief, Fournier's unlawful actions were willful and malicious,

9  and with the deliberate intent to injure Les Mills' business, thereby entitling Les Mills to

10  exemplary damages under Cal. Civ. Code § 3426.3(c) and/or attorneys' fees in an amount to be

11  proven at trial under Cal. Civ. Code § 3426.4.

12       86.    Les Mills has suffered and will continue to suffer irreparable harm as a result of

13  Fournier's actual and threatened misappropriation. Because Les Mills has no adequate remedy at

14  law for this present and future harm, it is entitled to an order prohibiting Fournier from using or

15  disclosing, or threatening to use or disclose, Les Mills' Confidential and Trade Secret Information,

16  from deleting any of Les Mills' Confidential and Trade Secret Information, and from obtaining

17  any benefit from his wrongful possession and use of the Confidential and Trade Secret

18  Information. Unless enjoined by this Court, said misappropriation of Les Mills' Confidential and

19  Trade Secret Information, actual or threatened, will cause great and irreparable injury to Les Mills.

20                    **<u>Third Cause of Action</u>**

21                      **(Breach of Contract)**

22                 **Brought by Plaintiff Les Mills U.S.**

23

24       87.    Plaintiff Les Mills U.S. re-alleges and incorporates by reference each and every

25  allegation contained in paragraphs 1 through 86 of this Complaint.

26       88.    As a condition of his employment with Les Mills U.S., Fournier signed and agreed

27  to abide by the terms of the CEO Agreement, the End of Full Time Employment Agreement, and

28  the Early Stage Ventures Lead Agreement, each of which prohibited Defendant from, among other

1    things, using or disclosing Les Mills' Confidential and Trade Secret Information. (*See* paragraphs

2    22-28, above.)

3         89.    Les Mills U.S. has done all, or substantially all, of the significant things that the

4    CEO Agreement, End of Full Time Employment Agreement, and Early Stage Ventures Lead

5    Agreement required it to do by, among other things, employing Mr. Fournier.

6         90.    All conditions required for Fournier's performance under the CEO Agreement and

7    Early Stage Ventures Lead Agreement have occurred or were excused.

8         91.    In Section 8(c) of the CEO Agreement, Fournier agreed that

9         during his employment and for a period of two (2) years thereafter, he will hold in
          confidence all Confidential Information[3] of the Company and the Associated
10        Companies that came into his knowledge during his employment by the Company
          and will not disclose, publish[,] or make use of such Confidential Information
11        without the prior written consent of the Company, except to the extent disclosure of
          Confidential Information is mandated by a court order or is otherwise necessary to
12        comply with applicable laws.

13        92.    In Section 8(d) of the CEO Agreement, Fournier further agreed

14        to hold in confidence all Trade Secrets[4] of the Company and the Associated
          Companies that came into his knowledge during his employment by the Company
15        and shall not disclose, publish, or make use of at any time after the date hereof such
          Trade Secrets without the prior written consent of the Company for as long as the
16        information remains a Trade Secret, except to the extent disclosure of a Trade
          Secret is mandated by a court order or is otherwise necessary to comply with
17        applicable laws.

18        93.    In Section 9 of the CEO Agreement, Fournier agreed that

19        All records, designs, patents, business plans, financial statements, manuals,
          memoranda, customer lists, computer data, computer information, and other
20        property or information delivered to or compiled by [Fournier] by or on behalf of
          the Company (including the respective subsidiaries thereof) or its representatives,
21        vendors[,] or customers shall be and remain the property of the Company, and be
          subject at all times to its discretion and control. Upon the request of the Company
22        and in any event, ***upon the termination of [Fournier's] employment with the
          Company, [Fournier] shall deliver all such materials to the Company***. (Emphasis
23        added.)

24        94.    Through the End of Full Time Employment Agreement, Fournier expressly agreed

25    that his obligations under Sections 8 through 11 and 19 of the CEO Agreement survived

26

27   [3] *See* paragraph 24 above for the definition of "Confidential Information" in the CEO Agreement.

28   [4] *See* paragraph 25 above for the definition of "Trade Secret" in the CEO Agreement.

18094171.1

termination of the CEO Agreement. (End of Full Time Employment Agreement, ¶ 6.)

95.   Fournier downloaded a large volume of files that fall within the CEO Agreement's definitions of Confidential and Trade Secret Information, including, but not limited to, board papers, strategy documents (including various Les Mills group, product, and department strategy documents), key financial documents, and music license agreements.

96.   Fournier breached the CEO Agreement and End of Full Time Employment Agreement by, among other things, deliberately downloading Les Mills' Confidential and Trade Secret Information to his laptop and desktop computers, and, on information and belief, potentially by transferring that information to his iCloud account, iTunes account, other cloud accounts, and/or to networks, servers, or other portable drives, and by failing to return all Confidential and Trade Secret information to Les Mills U.S. upon his resignation from the company.

97.   Fournier also threatens future breaches through the use or disclosure of Les Mills' Confidential and Trade Secret Information. Given that Fournier now works for Les Mills' direct competitor, Beachbody, he poses an unacceptable risk of improper use and disclosure of Les Mills' Confidential and Trade Secret Information.

98.   In Section 17 of the CEO Agreement, Fournier agreed that any breach of the confidentiality and trade secret provisions of the CEO Agreement could cause Les Mills U.S. irreparable harm, entitling it to injunctive relief without posting a bond:

> Because of the difficulty of measuring economic losses to the Company as a result of the covenants set forth in Sections 8 through 10, and because of the immediate and irreparable damage that would be caused to the Company for which monetary damages would not be a sufficient remedy, it is hereby agreed that in addition to all other remedies that may be available to the Company, at law or in equity, the Company shall be entitled to specific performance and any injunctive or other equitable relief as a remedy for any breach or threatened breach by [Fournier] of any provision of Sections 8 through 10 without the necessity of posting a bond unless otherwise required by law.

99.   Les Mills U.S. has suffered and will continue to suffer irreparable harm as a result Fournier's actual and threatened breaches. Because Les Mills U.S. has no adequate remedy at law for this present and future harm, it is entitled to injunctive relief under Section 17 of the CEO Agreement and other applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, Les Mills prays for judgment in its favor and against Defendant Fournier, as follows:

A.      Entry of judgment holding Fournier liable for misappropriation of trade secrets and breach of contract.

B.      For temporary, preliminary, and permanent injunctive relief requiring that Fournier, his agents, servants, employees, attorneys, and those in active concert or participation with them (1) shall not use, share, or disclose any of Les Mills' Confidential and Trade Secret Information, (2) shall return to Les Mills all copies of such information, (3) shall not destroy, delete, or modify any files or documents containing such information, without a court-approved protocol in place, and (4) shall not destroy, delete, or modify any record concerning how he acquired, used, or disclosed such information, without a court-approved protocol in place.

C.      For an award of general damages in an amount to be determined at trial.

D.      For an award of special damages in an amount to be determined at trial.

E.      For an award of exemplary damages for willful and malicious appropriation of trade secrets and attorney's fees under 18 U.S.C. § 1836(b)(3)(C)-(D) and California Civil Code §§ 3426.3(c) and 3426.4(a).

F.      For costs of suit.

G.      For any other relief that the Court deems just and proper.

DATED: December 17, 2021                         HANSON BRIDGETT LLP


                                    By:      /s/ Geoffrey R. Pittman
                                         KURT A. FRANKLIN
                                         GEOFFREY R. PITTMAN
                                         Attorneys for Plaintiffs, Les Mills International
                                         Limited, Les Mills Music Licensing Limited, Les
                                         Mills Media Limited, and Les Mills Media U.S.,
                                         Inc.

18094171.1

# EXHIBIT A

# EXHIBIT A

EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is made and entered into as of the 19the day of December 2016 (the "Effective Date") by and between Les Mills Media U.S., Inc. (the "Company" or "LMM") and Jean-Michel Fournier ("Executive").

R E C I T A L S

The Company desires to employ Executive and Executive desires to accept such employment with the Company on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and conditions set forth herein, and the performance of each, the parties hereto, intending to be legally bound, agree as follows:

AGREEMENTS

1.      **Term**. Company shall employ Executive, and Executive shall serve the Company, in the position of Chief Executive Officer ("CEO") beginning on December 1, 2016 (the "Effective Date") and will continue through May 31, 2017, unless terminated earlier by the Executive or the Company or extended by mutual written agreement between the Executive and the Company (the "Term"). Notwithstanding the foregoing, the Agreement is at-will and either party may terminate this Agreement prior to the expiration of the Term pursuant to Section 6, and with the effect set forth in, Section 7.

2.      **Position and Duties**. The Company hereby employs Executive as the Company's Chief Executive Officer. Executive shall have such responsibilities, duties, and authorities as set out in the Role Profile attached hereto as **Schedule 1** and incorporated herein by reference, and as may be prescribed by the Company's Board of Directors ("Board") from time-to-time. Executive shall fulfill his duties and responsibilities in a reasonable and appropriate manner and in compliance with the Company's delegated authorities (Delegated Authorities) set out in **Schedule 2** attached hereto and incorporated herein by reference, and as may be prescribed by the Company's Board of Directors ("Board") from time-to-time, policies and practices and the laws and regulations that apply to the Company's operation and administration.  In the event that the Executive's employment is extended by mutual agreement beyond May 31, 2017, Executive shall from June 1, 2017 devote his full business time and attention to the business and affairs of the Company and shall not be engaged in, or employed by or provide services to, any other business enterprise without the written approval of the Board.

3.      **Compensation**. For all services rendered by Executive, the Company shall compensate Executive as follows:

(a)     *Base Salary*. Company shall pay to Executive, in accordance with the Company's policies, procedures and practices in effect from time to time, an annual base salary (the "Base Salary") of          which shall prorated for the time worked, e.g., during the six-month term identified in Section 1 of this Agreement the prorated annual salary is          and each month is prorated at

(b)     *Perquisites, Benefits, and Other Compensation*. Except to the extent expressly modified by the provisions of **Schedule 3** attached hereto and incorporated herein by reference, Executive shall be eligible for the same perquisites and benefits as are made available to other executive employees of the Company, as well as such other perquisites or benefits as may be specified from time-to-time by the Board, including, without limitation, all the perquisites, benefits and other compensation set forth on **Schedule 3**. To the extent permitted by applicable law, Executive will bear the full cost of benefits to the extent that Executive elects to participate in the Company's employee benefit plans.

(c)     *Incentives – short term*. Executive shall be eligible for a Short Term Incentive ("STI") for the Term provided that Executive is employed by the Company at May 31, 2017 and the Company meets the performance targets set forth in the Chief Executive Officer's Performance Agreement (Short Term Incentive) attached hereto as **Schedule 4** and incorporated herein by reference, and Executive achieves the key performance indicators for the Term. In the event that the Executive's employment is extended by mutual agreement beyond May 31, 2017, the Executive shall be eligible for a STI for the part-fiscal year from June 1, 2017 to March 31, 2018 and each subsequent fiscal year, provided that the Executive is employed by the Company at the end of the relevant fiscal year and the Company meets the performance targets set forth in the Chief Executive Officer's Performance Agreement (Short Term Incentive) attached hereto as **Schedule 4A** and incorporated herein by reference, and Executive achieves the key



performance indicators for that year. The Board of the Company (or an appropriate committee thereof) shall set the annual STI performance and payment targets before the start of each fiscal year. Short Term Incentive payments, if any, shall be paid not later than the 30th day of September of the calendar year in which the Company's fiscal year ends. For the purposes of this Agreement and its Schedules, references to the Company's "fiscal year" means the period from 1 April to 31 March.

        **(d)**      *Incentives – long term*.  Executive shall be eligible to participate in the Long Term Incentive Scheme ("<u>LTI</u>") in accordance with the terms, conditions and requirements set out in <u>Schedule 5</u> attached hereto and incorporated herein by reference.

        **4.**      <u>Expense Reimbursement.</u> The Company shall reimburse Executive for (or, at the Company's option, pay) all business travel and other out-of-pocket expenses reasonably incurred by Executive in the performance of his services hereunder, including, without limitation, the business expenses set forth on <u>Schedule 3</u> attached hereto and incorporated herein by reference. All reimbursable expenses shall be appropriately documented in reasonable detail by Executive upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policies and applicable federal and state tax recordkeeping requirements.

        **5.**      <u>Travel</u>.  Executive acknowledges and agrees that his position may involve business travel.

        **6.**      <u>Termination</u>.  The following events shall trigger termination of the Executive's employment hereunder prior to the expiration of the Term:

        **(a)**      *Death or Disability*.  Upon the death of the Executive during the Term or, subject to applicable law, at the option of the Company in the event of the Executive's disability, upon thirty (30) days' written notice. The Executive shall be deemed disabled if an independent medical doctor certifies that the Executive has for ninety (90) consecutive days been disabled in a manner which has rendered him unable to perform the essential functions of his job duties with reasonable accommodation.

        **(b)**      *For Cause*.  The Company may terminate Executive's employment hereunder for "Cause" immediately upon the delivery by the Company to the Executive of a written notice describing in reasonable detail the facts or circumstances giving rise to the Executive's termination (the "<u>Termination Notice</u>") (which Termination Notice shall identify the Date of Termination (as defined in <u>Section 7(f)</u> below)), in the event that any one or more of the following has occurred:

        (i)      the Executive shall have committed an act of fraud, embezzlement, or misappropriation against the Company; or

        (ii)      the Executive shall have been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, any felony or any crime involving moral turpitude; or

        (iii)      the Executive shall have committed a material breach of any of the provisions of this Agreement and such breach continues for thirty (30) days after written notice of such breach has been given to the Executive; or

        (iv)      the Executive shall have refused, within ten (10) days after written notice, to obey any lawful resolution of or direction by the Board that is consistent with his duties under this Agreement; or

        (v)      the Executive shall have been chronically absent from work (excluding vacations, illnesses or protected leaves of absence) and shall have failed, within ten (10) days after notice, to perform his duties to the Company; or

        (vi)      the Executive has engaged in conduct or activities materially damaging to the property, business or reputation of the Company or an Associated Company (as defined in <u>Section 8(a)</u>); or

        (vii)      there is any material act or omission by Employee involving willful malfeasance or gross negligence in the performance of Employee's duties and responsibilities or the exercise of Employee's powers under this Agreement to the material detriment of the Company.

        **(c)**      *Termination by the Company Without Cause*.  The Company has the right to terminate the Executive's employment with the Company for any reason or no reason.

(d) *Termination by Executive Without Cause*.  The Executive has the right to terminate his employment with the Company for any reason or no reason.

7.   <u>Rights and Remedies on Termination</u>.

(a)   *Death or Disability*.  If the Executive's employment hereunder is terminated prior to the end of the Term pursuant to <u>Section 6(a)</u> as a consequence of his death or his disability, then the Executive or the Executive's estate, as applicable, shall be entitled to receive from the Company the sum of Executive's accrued obligations which shall consist of: (i) Executive's accrued but not yet paid Base Salary in effect at the time of such termination, if any, through the effective Date of Termination, (ii) accrued but unpaid vacation pay, if any, (iii) earned and accrued but not yet paid STI set forth on <u>Schedule 4, Schedule 4A</u> and LTI set forth on <u>Schedule 5</u> attached hereto, if any, with respect to any fiscal year prior to the Date of Termination  (iv) to the extent vested and payable, all benefits payable under the terms of any employee benefit plan, non-qualified deferred compensation plan or other arrangement, if any, as of the Date of Termination, and (v) all incurred and unreimbursed business expenses of Executive pursuant to <u>Section 4</u> hereof as of the Date of Termination (collectively, the "<u>Accrued Obligations</u>").  Any such payments and benefits payable by the Company shall be in addition to other rights and benefits the Executive, his spouse, beneficiaries or estate may be entitled to receive under all employee benefit and/or bonus plans in accordance with the terms of such plans, as applicable.  The Accrued Obligations shall be paid in a lump sum on the Date of Termination (except that in the event of any conflicts between this provision and the payment schedules set forth in either <u>Schedule 4, Schedule 4A and Schedule 5</u>, the timing of payments set forth in those schedules shall govern).

(b)   *For Cause Termination*.  If the Executive's employment hereunder is terminated at any time by the Company for "Cause" pursuant to <u>Section 6(b)</u> hereof, then the Executive shall be entitled to receive his Accrued Obligations. The Accrued Obligations shall be paid to Executive in a lump sum on the Date of Termination (except that in the event of any conflicts between this provision and the payment schedules set forth in either <u>Schedule 4, Schedule 4A and Schedule 5</u>, the timing of payments set forth in those schedules shall govern).

(c)   *Termination by the Company Without Cause Prior to May 31, 2017*.  If the Executive's employment hereunder is terminated at any time by the Company without Cause pursuant to <u>Section 6(c)</u> hereof prior to May 31, 2017, then the Executive shall be entitled to receive an amount equal to his Accrued Obligations. The Accrued Obligations shall be paid to Executive in a lump sum on the Date of Termination (except that in the event of any conflicts between this provision and the payment schedules set forth in either <u>Schedule 4, Schedule 4A</u> or <u>Schedule 5</u>, the timing of payments set forth in those schedules shall govern). Executive shall also be entitled, on receipt by the Company from Executive of a signed general release of claims in substantially the same form set forth on <u>Schedule 7</u> attached hereto and incorporated herein by reference ("<u>Release</u>"), to receive a severance payment ("<u>Severance Payment</u>") of an amount equal to the balance of Executive's Base Salary from the Date of Termination to May 31, 2017.  Subject to execution and non-revocation of the Release, the Severance Payment shall be paid to Executive in a lump sum within forty-five (45) days following the Date of Termination.

(d)   *Termination by the Company Without Cause From June 1, 2017*.  In the event that the Executive's employment hereunder is extended by mutual agreement of the parties beyond May 31, 2017 and the Executive's employment hereunder is subsequently terminated at any time by the Company without Cause pursuant to <u>Section 6(c)</u> hereof, then Executive shall be entitled to receive an amount equal to his Accrued Obligations. The Accrued Obligations shall be paid to Executive in a lump sum on the Date of Termination (except that in the event of any conflicts between this provision and the payment schedules set forth in either <u>Schedule 4, Schedule 4A</u> or <u>Schedule 5</u>, the timing of payments set forth in those schedules shall govern). Executive shall also be entitled, on receipt by the Company from Executive of a signed general release of claims in substantially the same form set forth on <u>Schedule 7</u> attached hereto and incorporated herein by reference ("<u>Release</u>"), to receive a severance payment ("<u>Severance Payment</u>") of an amount equal to 6 months of Executive's Base Salary. Subject to execution and non-revocation of the Release, the Severance Payment shall be paid to Executive in a lump sum within forty-five (45) days following the Date of Termination.

(e)   *Termination by Executive Without Cause*. If Executive's employment hereunder is terminated at any time by Executive without Cause pursuant to <u>Section 6(d)</u> hereof, then Executive shall be entitled to receive an amount equal to his Accrued Obligations.  The Accrued Obligations shall be paid to Executive in a lump sum on the Date of Termination (except that in the event of any conflicts between this provision and the payment schedules set forth in either <u>Schedule 4, Schedule 4A or Schedule 5</u>, the timing of payments set forth in those schedules shall govern).

(f)     *Provisions that Survive Termination or Expiration of Agreement.*  All rights and obligations of the Company and Executive under this Agreement shall cease as of the effective date of termination of Executive's employment (the "Date of Termination"), except that (i) any unfulfilled payment obligations and/or covenants of the Company under Sections 3, 4 or 7, shall survive such termination, and (ii) Executive's obligations under Sections 8 through 11 and 19 shall survive such termination in accordance with their terms.

(g)     *Right to Offset*.  Any amounts owed to Executive by the Company as a result of any termination of Executive's employment may be offset against any outstanding indebtedness of Executive to the Company as of the Date of Termination.

8.     **Trade Secrets and Confidential Information**.

(a)     For purposes of this Section 8, "Confidential Information" means any data or information (other than Trade Secrets) owned by the Company or any Associated Companies that is proprietary and confidential in nature and not generally known to the public or to competitors in the industry, including, but not limited to, any non-public information (regardless of whether in writing or retained as personal knowledge) pertaining to research and development; product costs and processes; stockholder information; pricing, cost, or profit factors; quality programs; annual budget and long-range business plans; marketing plans and methods; contracts and bids; and personnel. "Trade Secret" means trade secret as defined by applicable state law.  In the absence of such a definition, Trade Secret means information including, but not limited to, any technical or nontechnical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan, list of actual or potential customers or suppliers or other information similar to any of the foregoing, which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  "Associated Companies" means any parent or subsidiary of the Company and any entity in which the Company has a twenty percent or greater ownership interest.

Notwithstanding any of the foregoing, the parties hereby agree that the following shall be specifically excluded from the definitions of Confidential Information and Trade Secrets:

(i)     Information required to be disclosed by Executive in the ordinary course of carrying out his duties hereunder;

(ii)     Information that was already in the possession of Executive or any of his agents, advisors or attorneys (collectively, "Representatives"), or that was available to Executive or any of his Representatives on a non-confidential basis, prior to the time of disclosure to Executive or such Representatives;

(iii)     Information that was obtained by Executive or any of his Representatives from a third person which, insofar as is known to Executive or such Representatives having made reasonable inquiries, is not subject to any legal, contractual or fiduciary prohibition or obligation against disclosure;

(iv)     Information which was or is independently developed by Executive or any of his Representatives without violating any confidentiality obligations; or

(v)     Information which was or becomes generally available to the public through no fault of Executive.

(b)     Executive acknowledges that in the course of his employment with the Company, he has received or will receive and has had or will have access to Confidential Information and Trade Secrets of the Company and its customers and affiliates. Accordingly, he is willing to enter into the covenants contained in Sections 8 and 10 of this Agreement in order to provide the Company with what he agrees is reasonable protection for its interests.

(c)     Executive hereby agrees that, during his employment and for a period of two (2) years thereafter, he will hold in confidence all Confidential Information of the Company and the Associated Companies that came into his knowledge during his employment by the Company and will not disclose, publish or make use of such Confidential Information without the prior written consent of the Company, except to the extent disclosure of Confidential Information is mandated by a court order or is otherwise necessary to comply with applicable laws.

(d)      Executive hereby agrees to hold in confidence all Trade Secrets of the Company and the Associated Companies that came into his knowledge during his employment by the Company and shall not disclose, publish, or make use of at any time after the date hereof such Trade Secrets without the prior written consent of the Company for as long as the information remains a Trade Secret, except to the extent disclosure of a Trade Secret is mandated by a court order or is otherwise necessary to comply with applicable laws.

(e)      Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law.  Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Executive who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the Executive and use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

(f)      Notwithstanding the foregoing, the provisions of this paragraph will not apply to (i) information required to be disclosed by Employee in the ordinary course of carrying out his duties hereunder, or (ii) Confidential Information or Trade Secrets that otherwise becomes generally known in the industry or to the public through no act of Employee or any person or entity acting by or on Employee's behalf.

(g)      The parties agree that the restrictions stated in this Section 8 are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state law.  Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting the Company's rights under applicable state law to protect its trade secrets and confidential information.

9.      **Return of Company Property.**  All records, designs, patents, business plans, financial statements, manuals, memoranda, customer lists, computer data, customer information, and other property or information delivered to or compiled by Executive by or on behalf of the Company (including the respective subsidiaries thereof) or its representatives, vendors or customers shall be and remain the property of the Company, and be subject at all times to its discretion and control.  Upon the request of the Company and, in any event, upon the termination of Executive's employment with the Company, Executive shall deliver all such materials to the Company.

10.      **Work Product and Inventions.**

(a)      *Works.*  Executive acknowledges that Executive's work on and contributions to documents, programs, methodologies, protocols, and other expressions in any tangible medium which have been or will be prepared by Executive, or to which Executive has contributed or will contribute, in connection with Executive's services to the Company (collectively, "Works"), are and will be within the scope of Executive's employment and part of Executive's duties and responsibilities.  Executive's work on and contributions to the Works will be rendered and made by Executive for, at the instigation of, and under the overall direction of, the Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws.  However, to the extent that any court or agency should conclude that the Works (or any of them) do not constitute or qualify as a "work made for hire", Executive hereby assigns, grants, and delivers exclusively and throughout the world to the Company all rights, titles, and interests in and to any such Works, and all copies and versions, including all copyrights and renewals.  Executive agrees to cooperate with the Company and to execute and deliver to the Company, its successors and assigns, any assignments and documents the Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and Executive constitutes and appoints the Company as its agent to execute and deliver any assignments or documents Executive fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable.  Without limiting the preceding provisions of this Section 10(a), Executive agrees that the Company may edit and otherwise modify, and use, publish and otherwise exploit, the Works in all media and in such manner as the Company, in its sole discretion, may determine.

(b)      *Inventions and Ideas.*  Executive shall disclose promptly to the Company (which shall receive it in confidence), and only to the Company, any invention or idea of Executive, whether or not patentable, copyrightable or otherwise legally protectable and whether or not reduced to practice, that is in any way connected with Executive's services or related to the business of the Company, the Company's research or development, or

77487-0001/LEGAL20002266.2                                    5

demonstrably anticipated research or development (developed alone or with others), conceived or made during his employment with the Company or within three (3) months thereafter and hereby assigns to the Company any such invention or idea.  Executive agrees to cooperate with the Company and sign all papers deemed necessary by the Company to enable it to obtain, maintain, protect and defend patents covering such inventions and ideas and to confirm the Company's exclusive ownership of all rights in such inventions, ideas and patents, and irrevocably appoints the Company as its agent to execute and deliver any assignments or documents Executive fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable.  This constitutes the Company's written notification that this assignment does not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on Executive's own time as provided in <u>Section 10(c)</u>.

(c)     *Exception to Assignments*.  Executive understands that the provisions of this Agreement requiring assignment of intellectual property to the Company are limited to Section 2870 of the California Labor Code, which is attached hereto as <u>**Schedule 6**</u>, and do not apply to any intellectual property that (i) Executive develops entirely on his own time; <u>and</u> (ii) Executive develops without using Company equipment, supplies, facilities, or trade secret information; <u>and</u> (iii) do not result from any work performed by Executive for the Company; <u>and</u> (iv) do not relate at the time of conception or reduction to practice to the Company's current or anticipated business, or to its actual or demonstrably anticipated research or development.  Any such intellectual property will be owned entirely by Executive, even if developed by Executive during the time period in which he is employed by the Company.  Executive will advise the Company promptly in writing of any intellectual property that he believes meet the criteria for exclusion set forth herein.

(d)     *Disclosures Received in Confidence*.  To the extent this Agreement requires that Executive disclose intellectual property, to the Company, Executive understands and agrees that such disclosures will be received in confidence and disclosed only to those officers, employees or representatives of the Company reasonably necessary for the purposes of determining the Company's rights under this Agreement and/or applicable law.

11.     <u>Notification of New Employer</u>.  In the event that Executive's relationship with the Company terminates, Executive hereby grants consent to notification by the Company to Executive's new employer or consulting client about Executive's rights and obligations under this Agreement.

12.     <u>No Prior Agreements</u>.  Executive hereby represents and warrants to the Company that the execution of this Agreement by Executive and his employment by the Company and the performance of his duties hereunder will not violate or be a breach of any agreement with a former employer, client, or any other person or entity.

13.     <u>Assignment; Binding Effect</u>.  Executive understands that he has been selected for employment by the Company on the basis of his personal qualifications, experience, and skills.  Executive agrees, therefore, that he cannot assign all or any portion of his performance under this Agreement.  The Company may assign this Agreement to the purchaser of substantially all of the assets of the Company, or to any subsidiary or parent company of the Company.  Subject to the preceding two sentences, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective heirs, legal representatives, successors, and assigns.

14.     <u>Complete Agreement; Waiver; Amendment</u>.  Executive has made no oral representations, understandings, or agreements with the Company or any of its officers, directors, or representatives covering the same subject matter as this Agreement.  This Agreement, together with the referenced Schedules attached hereto, is the final, complete, and exclusive statement of expression of the agreement between the Company and Executive with respect to the subject matter hereof, and cannot be varied, contradicted, or supplemented by evidence of any prior or contemporaneous oral or written agreements.  This written Agreement may not be later modified except by a further writing signed by a duly authorized officer of the Company or member of the Board and Executive, and no term of this Agreement may be waived except by a writing signed by the party waiving the benefit of such term.

15.     <u>Notice</u>.  Whenever any notice is required hereunder, it shall be given in writing addressed as follows:

To the Company:     Les Mills Media U.S., Inc.
                    Attn.:  Keith Muirhead (People & Culture Director)
                    c/- Les Mills International Limited

22 Centre Street, Auckland, 1010
New Zealand

Email: keith.muirhead@lesmills.com
Telephone No.: +64 9 366 9900
Facsimile No.: + 64 9 366 9901

To the Executive:     Jean-Michel Fournier



16.     **Severability; Headings**. If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The section headings are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent of the Agreement or of any part hereof.

17.     **Equitable Remedy**. Because of the difficulty of measuring economic losses to the Company as a result of a breach of the covenants set forth in Sections 8 through 10, and because of the immediate and irreparable damage that would be caused to the Company for which monetary damages would not be a sufficient remedy, it is hereby agreed that in addition to all other remedies that may be available to the Company, at law or in equity, the Company shall be entitled to specific performance and any injunctive or other equitable relief as a remedy for any breach or threatened breach by Executive of any provision of Sections 8 through 10. The Company may seek temporary and/or permanent injunctive relief for an alleged violation of Sections 8 through 10 without the necessity of posting a bond unless otherwise required by law.

18.     **Tax Withholding**. The Company is authorized to withhold, from any payment made pursuant to this Agreement, all applicable federal, state or local income taxes and employment taxes.

19.     **Cooperation**. During the Term and thereafter, the Executive shall cooperate with the Company and be reasonably available to the Company with respect to continuing and/or future matters related to the Executive's employment with the Company, whether such matters are business-related, legal, regulatory or otherwise (including, without limitation, the Executive appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into the Executive's possession). Following the Term of Executive's employment, the Company shall reimburse the Executive for all reasonable out of pocket expenses incurred by the Executive in rendering such services that are approved by the Company.

20.     **Section 409A.**

The parties intend that payments and benefits under this Agreement, including the Schedules attached hereto, comply with or be exempt from Section 409A of the U.S. Internal Revenue Code and the regulations and guidance promulgated thereunder (collectively "Code Section 409A"), and the Company shall have complete discretion to interpret and construe this Agreement and any associated documents in any manner that establishes an exemption from (or compliance with) the requirements of Code Section 409A. If this Agreement (or of any award of compensation, including, without limitation, equity compensation or benefits) does not accurately reflect its intended establishment of an exemption from (or compliance with) Code Section 409A, as demonstrated by consistent interpretations or other evidence of intent, such provision shall be considered ambiguous as to its exemption from (or compliance with) Code Section 409A and shall be interpreted by the Company in a manner consistent with such intent, as determined in the discretion of the Company.

A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that are considered nonqualified deferred compensation under Code Section 409A upon or following a termination of employment unless such termination is

also a "separation from service" within the meaning of Code Section 409A, and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "such a separation from service." The determination of whether and when a separation from service has occurred for proposes of this Agreement shall be made in accordance with the presumptions set forth in Section 1.409A-1(h) of the Treasury Regulations.

Any provision of this Agreement to the contrary notwithstanding, if the Company's common stock is publicly traded on an established exchange at the time of the Executive's separation from service, and the Company determines that the Executive is a "specified employee" within the meaning of Code Section 409A, then to the extent any payment or benefit that the Executive becomes entitled to under this Agreement on account of such separation from service would be considered nonqualified deferred compensation under Code Section 409A, such payment or benefit shall be paid or provided at the date which is the earlier of (i) six (6) months and one day after such separation from service and (ii) the date of the Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or provided to the Executive in a lump-sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

Any reimbursements provided under this Agreement that constitute deferred compensation within the meaning of Code Section 409A shall be made or provided in accordance with the requirements of Code Section 409A, including, without limitation, that (i) in no event shall any fees, expenses or other amounts eligible to be reimbursed by the Company under this Agreement be paid later than the last day of the calendar year next following the calendar year in which the applicable fees, expenses or other amounts were incurred; (ii) the amount of expenses eligible for reimbursement in any given calendar year shall not affect the expenses that the Company is obligated to reimburse in any other calendar year, provided that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Code Section 105(b) solely because such expenses are subject to a limit related to the period the arrangement is in effect; (iii) the Executive's right to have the Company pay or provide such reimbursements may not be liquidated or exchanged for any other benefit; and (iv) in no event shall the Company's obligations to make such reimbursements apply later than the Executive's remaining lifetime.

For purposes of Code Section 409A, the Executive's right to receive any installment payments shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (for example, "payment shall be made within forty-five (45) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company. In no event may the Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement, to the extent such payment is subject to Code Section 409A.

The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Code Section 409A but do not satisfy an exemption from, or the conditions of, Code Section 409A.

21. **Construction.** In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

22. **Governing Law.** All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in the state or federal courts sitting in the state of California. The parties hereto hereby (a) submit to the exclusive jurisdiction of the courts in the state of California, for the purpose of any action arising out of or relating to this Agreement brought by any party hereto and (b) irrevocably and unconditionally waive, and agree not to assert by way of motion, defense, or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the venue of the action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any of the above-named courts. The parties hereto further agree that any action arising out of or relating to this Agreement shall be governed by the laws of the state of California except to the extent that application of such laws would result in any dispute arising out of or related to this Agreement being governed by the laws of a state other than California and/or resolved in a court other than a state or federal court sitting in the state of California.

23. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to

be an original and all of which, when taken together, shall constitute one instrument.

24.     **Delivery by Electronic Means.**  This Agreement and any amendments hereto or notices required to be served hereunder, to the extent signed and delivered by means of a PDF, facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Employment Agreement to be duly executed as of the date first written above.

COMPANY:

LES MILLS MEDIA U.S., INC.

By: _____

Title: _____

EXECUTIVE:

_____
Jean-Michel Fournier

# EXHIBIT B

# EXHIBIT B

**LesMills**

6 September 2021

Jean-Michel Fournier

EMAIL: jean-michel.fournier@lesmills.com

END OF FULL TIME EMPLOYMENT AGREEMENT

Dear Jean-Michel

You have indicated that you do not wish to return to your full-time role as the CEO of Les Mills Media. This letter agreement ("Letter Agreement") sets out the terms under which you ("You" or "Your") and Les Mills Media U.S. Inc. (the "Company") (collectively, the "Parties") agree Your employment agreement with the Company dated 1 December 2016 (Employment Agreement) has ended, amicably and on mutually satisfactory terms.  Specifically, the Parties agree:

1.   The Employment Agreement ended on 31 August 2021 by mutual agreement of the Parties.

2.   The Company will offer You a nine-month fixed term part time employment contract, with effect from 1 September 2021 to 31 May 2022, to be documented separately, based on 2 working days per week, at your current salary, pro rata to reflect 2 working days per week. Continuation of current benefits (401K pro-rated of compensation amount) and expenses reimbursement as current. At your request, the Company has, amongst other factors, considered the vesting dates of your allocations in the long-term incentive referred to in paragraph 3(b) below in determining the duration of the fixed term employment.

3.   You agree You are not entitled to, and specifically waive any entitlement You may have, under the Employment Agreement, to:

     a.   the FY22 Short Term Incentive under clause 3(c) of the Employment Agreement (as documented in a letter to you on or about 5 May 2021).  by You are forfeited for no consideration or payment. Your participation in the FY22 STI is forfeited for no consideration or payment; and

     b.   the long term incentive scheme as set out in Schedule 5 of the Employment Agreement, provided however that shares in the LMI Employee Share Plan (Plan) that have been allocated prior to 31 August 2021 and which vest prior to 31 May 2022 (as set out in the Appendix to this Letter Agreement) will be paid out on 31 August 2022 (or at end of your fixed term employment, whichever is earlier, provided you have not stopped working for the Company for a reason which is not an Involuntary Event (as defined in the Plan rules) and are not subject to an investigation into a breach of your employment terms) as required by US tax laws.  You understand and agree that You are solely responsible for any and all liability under state and federal tax laws arising from the payments made under the long term incentive, and that the Company makes no warranty concerning the treatment of any funds.

4.   You further acknowledge and agree that your participation in the Les Mills International phantom share scheme as detailed in the offer letter to You dated 20 July 2019 (LTIP Offer Letter) ends with effect from 31 August 2021.  All Unvested Phantom Shares (as defined in the LTIP Offer Letter) held by You are forfeited for no consideration or payment.

5.   No severance is payable with respect to the ending of the Employment Agreement.

6.   You acknowledge that your obligations under Sections 8 through 11 and 19 of your Employment Agreement survive termination in accordance with their terms. To enable the Company to exercise its rights under Section 11 of your Employment Agreement, You agree to notify the Company if you accept employment or agree to provide services to a competitor of the Company or Les Mills Group.

7.   You and the Company acknowledge and agree that this Letter Agreement constitutes a full, final, and complete settlement of differences relating to the subject matter hereof and supersedes and replaces any and all other written or oral exchanges, agreements, understandings, arrangements, or negotiations

| **LES MILLS MEDIA LTD** |
|---|

22 CENTRE STREET, FREEMANS BAY, AUCKLAND 1010, NZ | **T** +64 9 366 0000 | **F** +64 9 366 9901 | **E** info@lesmills.com

**LESMILLS**

relating to the subject matter hereof.

8. No provision of this Letter Agreement may be changed, altered, modified, or amended except in writing signed by You and a duly authorized representative of the Company.

9. If any action at law or in equity is necessary to enforce or interpret the terms of this Letter Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

10. THE PARTIES AGREE THAT ANY AND ALL DISPUTES ARISING OUT OF THE TERMS OF THIS LETTER AGREEMENT, THEIR INTERPRETATION, AND ANY OF THE MATTERS HEREIN RELEASED, SHALL BE SUBJECT TO ARBITRATION IN SAN FRANCISCO COUNTY, BEFORE JUDICIAL ARBITRATION & MEDIATION SERVICES ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES ("JAMS RULES"). THE ARBITRATOR MAY GRANT INJUNCTIONS AND OTHER RELIEF IN SUCH DISPUTES. THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO ANY CONFLICT-OFLAW PROVISIONS OF ANY JURISDICTION. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE, AND BINDING ON THE PARTIES TO THE ARBITRATION. THE PARTIES AGREE THAT THE PREVAILING PARTY IN ANY ARBITRATION SHALL BE ENTITLED TO INJUNCTIVE RELIEF IN ANY COURT OF COMPETENT JURISDICTION TO ENFORCE THE ARBITRATION AWARD. THE PARTIES TO THE ARBITRATION SHALL EACH PAY AN EQUAL SHARE OF THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH PARTY SHALL SEPARATELY PAY FOR ITS RESPECTIVE COUNSEL FEES AND EXPENSES; PROVIDED, HOWEVER, THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY. NOTWITHSTANDING THE FOREGOING, THIS SECTION WILL NOT PREVENT EITHER PARTY FROM SEEKING INJUNCTIVE RELIEF (OR ANY OTHER PROVISIONAL REMEDY) FROM ANY COURT HAVING JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER OF THEIR DISPUTE RELATING TO THIS AGREEMENT AND THE AGREEMENTS INCORPORATED HEREIN BY REFERENCE. SHOULD ANY PART OF THE ARBITRATION AGREEMENT CONTAINED IN THIS PARAGRAPH CONFLICT WITH ANY OTHER ARBITRATION AGREEMENT BETWEEN THE PARTIES, THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT SHALL GOVERN.

If the terms set forth in this Letter Agreement are acceptable, please sign below and return it to Clive Ormerod clive.ormerod@lesmills.com on or before the close of business on Wednesday 8 September, 2021.

Sincerely,

Phillip Mills
Executive Director, Les Mills International Limited
on behalf of the Board of Les Mills Media U.S. Inc.

ACKNOWLEDGEMENT AND AGREEMENT

I have carefully read, know, understand and agree to the terms and conditions set out in the Letter Agreement above, including its final and binding effect, and sign voluntarily.

_____          September 7th 2021
                                        _____
*Jean-Michel Fournier*                  Date

| LES MILLS MEDIA LTD |
| --- |

**LESMILLS**

APPENDIX – LMI Employee Share Plan Shares vesting prior to 31 May 2022

|  | Number of ESP Shares | Grant Date | Vesting Date | Payment Date |
|---|---|---|---|---|
| 1 | 701 | 31-May-18 | 31-May-18 | 31-Aug-22 |
| 2 | 3,572 | 23-May-19 | 23-May-22 | 23-May-22 |
| 3 | 1,231 | 31-May-19 | 31-May-19 | 31-Aug-22 |
| 4 | 908 | 31-May-20 | 31-May-20 | 31-Aug-22 |
| 5 | 1,955 | 31-May-21 | 31-May-21 | 31-Aug-22 |

**LES MILLS MEDIA LTD**

22 CENTRE STREET, FREEMANS BAY, AUCKLAND 1010, NZ **l T** +64 9 366 0000 **l F** +64 9 366 9901 **l E** info@lesmills.com

# EXHIBIT C

# EXHIBIT C

**LesMills**

6 September 2021

Jean-Michel Fournier

**By email:** jean-michel.fournier@lesmills.com

Dear Jean-Michel

We're delighted to offer you the position of Early Stage Ventures Lead, with Les Mills Media U.S., Inc. (the "Company" and together with Les Mills International Limited and its subsidiaries, the "Les Mills Group"). Please see below the terms of our offer to you:

- **Employer:** Les Mills Media U.S., Inc

- **Job Title:** Early Stage Ventures Lead

  A copy of the Position Description is **attached**. Please note that Les Mills Media U.S., Inc and Les Mills International Limited reserve the right to change your job duties from time to time.

- **Term:** 1 September 2021 to 31 May 2022 unless terminated earlier by you or the Company or extended by mutual written agreement between you and the Company (the "Term").  Notwithstanding the foregoing, the Agreement is at-will and either party may terminate this Agreement prior to the expiration of the Term. At the conclusion of the Term, the parties agree that you will be deemed to have voluntarily resigned and you will not be entitled to any severance payment under your previous employment agreement with Les Mills Media U.S., Inc. or otherwise. If the Company terminates your employment at will, the shares in the LMI Employee Share Plan which vest in May 2022 will be paid out on 31 August 2022 (or at end of your fixed term employment, whichever is earlier) as required by US tax laws.

- **Annual gross salary:** USD███ per annum, pro rata from USD$███ based on 2 working days per week.

- **Paid time off:** Full time employees will accrue paid vacations at the rate of 20 PTO days per year which may be accrued up to 160 hours, pro-rata based on 2 working days per week.

- **Federal holidays:** You will be eligible for 8 federal holidays in accordance with company policy.

- **Sick leave:** Full time and part-time employees will be eligible to accrue a maximum of 6 paid sick days (48 hours) per year in accordance with California State law, pro-rata based on 2 days' work per week.

- **Healthcare, vision, dental plan:** You have opted to not participate in the Company's healthcare, vision, or dental plan.

- **401K:** You have opted to participate in the Company's 401K plan. Contributions will be based on the gross salary set out above, pro-rata based on 2 working days per week.

- **Business expenses:** The Company will reimburse you for all travel, accommodation, office supplies and other genuine business-related expenses reasonably incurred by you in the course of performing your duties in accordance with the Company's usual business expenses reimbursement policy and budget. The Company will provide you with a laptop, carry-on bag, printer, mobile phone and pay for any other telecommunication related requirements you may have while performing your duties.

- **Gym membership:** The Company will reimburse you up to $49 per month for a gym or wellness membership.

- **Work location:** San Jose / Bay area; Travel to Chicago and Auckland, New Zealand will also be required on an ongoing basis.

**LES MILLS MEDIA LTD**

22 CENTRE STREET, FREEMANS BAY, AUCKLAND 1010, NZ | **T** +64 9 366 0000 | **F** +64 9 366 9901 | **E** info@lesmills.com

# LesMills

- **Work hours:** 2 days per week or as required to effectively perform your duties taking into account the global nature of the Les Mills business.

- **Confidentiality and Work Product:**  You agree to keep confidential information regarding Les Mills Media U.S., Inc and the Les Mills Group that comes to your attention in the course of performing your duties confidential and not to share with any third parties without Les Mills Media U.S., Inc.'s consent.  You acknowledge that your work product will be regarded as "work made for hire" as that term is used in the United States Copyright Laws and be owned by Les Mills Media U.S., Inc. In addition, you may be asked to sign a proprietary information and invention agreement with Les Mills Media U.S., Inc. and the Les Mills Group.

- **Employee Duty of Loyalty**.  You acknowledge and understand that California employees owe their employers a fiduciary duty of loyalty, and that while employed by the Company, and consistent with California Labor Code, you must give preference to the Company to all business. If You engage in any outside employment, you will immediately notify Les Mills.  Further, to protect Les Mills' confidential information, proprietary information, trade secrets, and business interest, if you engage in outside employment, you agree to, and understand, the following:

  o Outside employment must not interfere with your work performance or work schedule;

  o You may not use the Company's property, trademarks, brand, or reputation in connection with any outside employment;

  o You must comply with all of the Company's policies, including those related to conflicts of interest, confidentiality, and protection of confidential, proprietary, and trade secret information; and

  o During Term, and any subsequent employment by the Company, you may not engage in any outside employment for an employer that the Company, acting reasonably considers:

    ▪ is a major competitor of the Les Mills Group; or

    ▪ otherwise competes with the Les Mills Group, without the prior written consent of the Company.

    Nothing in this provision is intended to restrict post-employment mobility, as is allowed by law.

Also, please note that this letter sets forth the terms of your employment with Les Mills Media U.S., Inc. Les Mills Media U.S., Inc will be an at-will employer. This means that your employment with the Company may be ended by you or the Company at any time, for any reason or for no reason. This letter does not constitute an employment contract.

We are excited about the future and believe you will continue to make a valuable contribution to the success of our digital business.

Best Regards,

Clive Ormerod
Chief Executive Officer
Les Mills International, Ltd

**LES MILLS MEDIA LTD**

22 CENTRE STREET, FREEMANS BAY, AUCKLAND 1010, NZ | **T** +64 9 366 0000 | **F** +64 9 366 9901 | **E** info@lesmills.com